DEBORAH CONNER SCOTT
1234 N. HAYWORTH AVE #124
WEST HOLLYWOOD, CA 90046
(310) 500-9593

IN THE
UNITED STATES DISTRICT COURT
WESTERN DIVISION OF THE STATE OF CALIFORNIA

FILED
CLERK, U.S. DISTRICT COURT

DEC - 4 2018

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

Deborah Conner Scott,

           Plaintiff Pro Se

v.

Hayworth House, LP and HDSI Management,
Inc.,

           Defendants.

LACV18 10085 JAK-JPR

Docket No.

)
)
)
)
)
)
)
)
)
)
)
)

## COMPLAINT

Plaintiff Deborah Conner Scott, Plaintiff, respectfully submits her Complaint Pro Se in the above-captioned matter, as follows:

### I. PRELIMINARY STATEMENT

Plaintiff institutes this action for compensatory and punitive damages for mental anguish, pain and suffering, and for Defendants' willful and wanton conduct in blatantly disregarding her chronic lung diseases. Plaintiff alleges that Defendants demonstrated gross negligence in denying her reasonable accommodations, thereby contributing to the exacerbation of her COPD.  Additionally, Defendants' willful and reckless conduct contributed to Plaintiff's poor quality of life by their denying her the major life activities including, but not limited to, breathing and sleeping, while exposing her to toxic inhalants and smoke in her present indoor environment, and refusing to change it.

1

Plaintiff files this Complaint against Defendants for multiple violations as set forth in the following statutes and regulatory provisions in regard to reasonable accommodations, as follows:

a) It is unlawful to refuse to rent or negotiate for rental or sale or otherwise make unavailable or deny a dwelling to any person because of a disability, 42 U.S.C. § 3604(f)(1); 24 C.F.R. § 100.202(a)(1)(2012).

b) Discrimination under 42 U.S.C. § 3604(l)(l) includes denying a person with a disability a reasonable accommodation when such accommodation may be necessary to afford such person an equal opportunity to use and enjoy a dwelling, 42 U.S.C. § 3604(f)(3)a); 24 C.F.R. § l00.204(a) (2012).

c) A reasonable accommodation is a change in a rule, policy, practice or service when such change may be necessary to afford a person with a disability the equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B); 24 C.F.R. § l00.204(a) (2012).

d) It is unlawful to discriminate against a person in the terms, conditions, or privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with such dwelling, because of a person's disability, 42 U.S.C. § 3604(f)(2); 24 C.F.R. § l00.65 (2012).

e) It is unlawful to make statements with respect to the rental of a dwelling that indicate any preference. limitation or discrimination based on disability or an intention to make any such preference, limitation or discrimination 42 U.S.C. § 3604(c); 24 C.F.R. § l00.75(a) (2012).

g) The Act defines "handicap" as a physical or mental impairment which substantially limits one or more of a person's major life activities, a record of having such an impairment, or being regarded as having such an impairment. Although the term "handicap" appears in the Fair Housing Act and its implementing regulations, the Charge and Determination of Reasonable Cause use the terms *disability* and *handicap* interchangeably. 42 U.S.C. § 3602(h); 24 C.F.R. § l00.201 (2012).

h) It is a violation of the Fair Housing Act for any person to refuse to make a reasonable accommodation in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas.

i) The failure to make a timely determination after meaningful review amounts to constructive denial of a requested accommodation, as an indeterminate delay has the same effect as an outright denial, for purposes of a failure-to-accommodate claim under the Fair Housing Act (FHA). Fair Housing Act, § 804(f)(3)(B), 42 U.S.C.A. 3604(f)(3)(B).

DEFINITIONS:

a) A wanton act is an act done by a person in reckless disregard of the rights of another. When a person does an act without considering its consequences it is called a wanton act.

b) Gross negligence is the lack of *slight diligence or care* or a *conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party.*

c*)* Willful act is an act done voluntarily with either an intentional disregard of, or plain indifference to, the requirements of Acts, regulations, statutes or relevant policies.

d) Peaceful enjoyment is the right to the undisturbed use and enjoyment of real property by a tenant, a covenant in almost all lease agreements.

e) Quality of Life is the daily activities that people undertake that have been enhanced by external factors, natural factors such as good water, clean air, outdoor activities, open spaces. It also relates to how well a person with a disability is able to live as near to normal life as possible.

f) Exacerbation is defined as a worsening. In medicine, exacerbation may refer to an increase in the severity of a disease or its signs and symptoms.

## II. PARTIES AND JURISDICTION

1.   Plaintiff Deborah Conner Scott is an individual and a citizen of California, residing at 1234 N. Hayworth Avenue, #124, West Hollywood, CA 90046, a HUD-assisted low-income senior apartment complex (hereinafter *Hayworth House*).

2.   Defendant Hayworth House, LP is a California Limited Partnership whose principal place of business is at the offices of West Hollywood Community Housing Corporation (WHCHC), its authorized agent, 7530 Santa Monica Blvd, West Hollywood, CA 90046.

3. Defendant HDSI Management, Inc. is a California Corporation whose principal place of business is located at 3460 S Broadway, Los Angeles, CA 90007 (hereinafter *HDSI).*

4.   This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

## III.  FACTUAL ALLEGATIONS

5.   Plaintiff is a victim of three chronic lung diseases, Chronic Obstructive Pulmonary Disease (COPD), bronchiectasis, chronic bronchitis (a form of COPD), and Mycobacterium avium complex (MAC). Plaintiff additionally suffers from Major Depressive and Anxiety Disorder, Alopecia and osteoarthritis in her right hip (Doctors' Correspondence and Requests (collectively incorporated herein as Exhibit A-1 through A-7).

6.   Plaintiff was first diagnosed with COPD in March, 2015, while she was a tenant in her present dwelling at Hayworth House. She was diagnosed with bronchiectasis and mild asthma circa 2013, and with MAC in 2015.  She additionally has regular flareups of osteoarthritis in her right hip.

7.   COPD is the third leading cause of death in the United States. COPD likely causes  serious long-term disability and early death.

8.   MAC is a combination of two bacteria infecting the lungs which can be found in water, dirt, and dust. It is a bacterial infection that can cause life-threatening symptoms. Both people with lung conditions and elderly women are extremely susceptible to being infected by MAC, and people are infected when the bacteria are inhaled or swallowed. MAC is identified as a chronic lung disease inasmuch as its prescribed treatment, a daily dose of three (3) antibiotics for two years, is arduous and is not a guaranteed cure.

9. Bronchiectasis is a chronic condition where the walls of the bronchi are thickened from inflammation and infection. People with bronchiectasis have periodic flare-ups of breathing difficulties.

10.   Alopecia is a medical condition that causes hair loss. Alopecia can be triggered by significant stressors in a patient's life, either physical health or psychological health.

11.   Plaintiff and Defendants HDSI Management Company, Inc. and Hayworth House, LP, entered into an agreement for reasonable accommodations on or about February 8, 2017,  (incorporated herein as Exhibit "B").

### IV.  FIRST CAUSE OF ACTION

12.   Plaintiff states that paragraphs 13 through 25 of this Complaint are allegations and claims in regard to being denied reasonable accommodations by Defendants for a designated parking space within the structure of Hayworth House. Plaintiff further reiterates that she is Pro Se in this matter, and has researched the Federal Rules of Procedure as a lay person, and she is making statements of fact, with some allegations being plausible.

13.   Plaintiff incorporates herein as Exhibit "C", her correspondence dated December 17, 2017, written to Defendants' attorney in response to his correspondence (Exhibit "D"), said exhibit serving as a reference, in part and/or its entirety, to this cause of action.

14.   Plaintiff alleges that Defendants denied Plaintiff a reserved parking space within the onsite parking structure of Hayworth House, as a reasonable accommodation, Defendants stating that providing her same was an ***undue burden***

**and not reasonable,** in direct violation of the following statutes, including but not limited to 42 U.S.C. § 3604(f)(3)a); 24 C.F.R. § l00.204(a) (2012), 42 U.S.C. § 3604(f)(3)a); 24 C.F.R. § l00.204(a) (2012), See:  Exhibit "D" Page 3.

15. Plaintiff alleges that Defendants willfully ignored her doctors' requests for parking accommodations, and denied her a reserved parking space while placing her fourth on the parking waitlist, in direct violation of the following statutes, including but not limited to 42 U.S.C. § 3604(f)(3)(B); 24 C.F.R. § l00.204(a)(2012) and 42 U.S.C. § 3604(f)(2); 24 C.F.R. § l00.65 (2012), See:  Exhibit "B", Item 11, Exhibit "G".

16.   Plaintiff alleges that Defendant HDSI threatened Plaintiff as to the likely towing of her vehicle, while exercising her rights to park in the Hayworth House parking structure in any reserved space that was vacant, a direct violation of the following statutes, including but not limited to 42 U.S.C. § 3617; 24 C.F.R. § l00.400(b), (c)(l) and (c)(2) (2012) and 42 U.S.C. § 3604(f)(3)a); 24 C.F.R. § l00.204(a) (2012), See:  Exhibit "E", Exhibit "K", page 2.

17.   Plaintiff alleges that Defendant HDSI stated to Plaintiff, in reference to her receiving reasonable accommodations, that it is Hayworth House's policy that any tenant moving into Hayworth House without a vehicle and who subsequently acquires one, that said tenant must go to the bottom of the parking *waitlist*, Defendant stating that those who ask for reasonable accommodations for onsite parking must be treated in accord with that same reserved parking policy.  See:  Exhibit "F" and Exhibit "K" page 2.

18.  Plaintiff alleges that Defendants' onsite manager, Alex Gristenko, preempted the parking waitlist to accommodate both  tenants  and  non-tenants  in  Hayworth

House's onsite parking structure. Plaintiff further alleges that Defendants' onsite manager gives out reserved parking spaces while exercising blatant discrimination and arbitrary decisions, and as a result of Defendants' special parking policy, allows the storage of a vintage automobile in one of the two handicapped spaces in said parking garage for at least two years, in direct violation of the following statutes, including but not limited to 42 U.S.C. § 3604(f)(2); 24 C.F.R. § l00.65 (2012), 42 U.S.C. § 3604(f)(3)a); 24 C.F.R. § l00.204(a) (2012), See:  Exhibits "G"and "J"-1.

19.   Plaintiff alleges that Defendants denied her a reserved parking space in another of West Hollywood's low-income, HUD-assisted apartment complexes, *Norton-Laurel Apartments*, two blocks away from Hayworth House. Said garage has available parking spaces, at least one to Plaintiff's knowledge, in direct violation of the following statues, including but not limited to 42 U.S.C. § 3604(f)(3)(B); 24 C.F.R. § l00.204(a) (2012), See:  Exhibit "C".

20.   Plaintiff alleges that Defendant Hayworth House, LP's employee has a reserved parking space allotted to her at said *Norton-Laurel Apartments,* and illegally parks her automobile during her work hours at Hayworth House in one of two only handicapped spaces while the tenant owning space is at work.  Plaintiff further alleges that said employee has never been threatened with likely towing while parked in another tenant's reserved space, as was Plaintiff, in direct violation of the following statutes, including but not limited to 42 U.S.C. § 3604(f)(2); 24 C.F.R. § l00.65 (2012), See:  Exhibit "J-9".

21. Plaintiff alleges that Defendant HDSI commented to Plaintiff that there was *no preferential treatment* in its assigning reserved parking spaces to tenants (Exhibit

"G").  Plaintiff further alleges that Defendants' onsite manager apprises all new tenants that there are no reserved parking spaces available, and suggests that they illegally obtain a handicap placard from the DMV with authorizations from their physicians, to enable them to park in the street which is permit parking only.   Plaintiff alleges that none of said tenants on waitlist is handicapped except herself, See:  Exhibits "F" and Exhibit "J"-1 through-9.

22.  Plaintiff alleges that Defendants' onsite manager's actions enables him to arbitrarily, with discrimination, assign available parking spaces to other tenants and non-tenants, thereby leaving Plaintiff to park on the street against her doctors' written requests, See:  Exhibits "C", "A-4, -5 and -7" and "J"-1 through -8.

23.   Plaintiff alleges that the Hayworth House parking waitlist, according to her records, consists of 1 tenant waiting three (3) plus years for a reserved parking space; 1 tenant waiting two (2) plus years; and 3 tenants (including Plaintiff) waiting over one (1) year.  See:  Exhibit "K", page 2.

24.   Plaintiff alleges that parking her vehicle on the street puts her under both physical and emotional distress as to finding a parking space, with the possibility of having to walk two to three blocks at times to get home at night, sometimes in very cold weather.   As reference, the City of West Hollywood has little to no parking on its residential streets at night, which classes parking to be at a premium. See: Exhibits A-4, -5 and -7 and Exhibit "C".

25. Plaintiff alleges that in regard to her acquiring a reserved parking space as a reasonable accommodation, Defendants suggested to Plaintiff that she was free to breach her lease without penalty, move out and abandon her home, or place herself on

the bottom of another apartment building within the property management's profile of properties, all in Los Angeles proper, and be subjected to other apartment guidelines and regulations for parking, a direct violation of the following statutes, including, but not limited to 42 U.S.C. § 3604(f)(3)a); 24 C.F.R. § l00.204(a) (2012),42 U.S.C. § 3604(f) (2); 24 C.F.R. § l00.65 (2012), 42 U.S.C. § 3617; 24 C.F.R. § l00.400(b), (c)(l) and (c)(2) (2012), See:  Exhibit "D", page 3.

## V.  SECOND CAUSE OF ACTION

25.   Paragraphs 26 through 34 of this Complaint are allegations and claims in regard to her being denied reasonable accommodations by Defendants, said accommodations being requested as to smoke and toxic inhalants moving directly into her dwelling from the street, sidewalk and common areas in close proximity of it. Plaintiff further reiterates that she is Pro Se in this matter, and has researched the Federal Rules of Procedure as a lay person, and she is making statements of fact, with some allegations being plausible.

26.    Plaintiff incorporates herein as Exhibit "C", her correspondence dated December 17, 2017, written to Defendants' attorney in response to his correspondence (Exhibit "D"), said exhibit serving as a reference, in part and/or its entirety, in this cause of action

28.    Plaintiff alleges that Item 9 of the Agreement provides for Defendants' placement of ten (10) no-smoking signs in places of their discretion in an effort to alert tenants and non-tenants as to a no-smoking area in the vicinity of Plaintiff's dwelling and the common areas of Hayworth House, where smoke readily drifts into her apartment. Plaintiff further alleges that Defendants' interpretation of FHA law as to

reasonable accommodations is the placement of no-smoking signs and their legal answer for not having to relocate her to a dwelling substantially away from the direct movement of smoke and toxic inhalants.  See:  Exhibit "B", Item 10.

29.   Plaintiff alleges that just four (4) out of 10 no-smoking signs are placed in the vicinity of her dwelling in public and common areas outside of the no-smoking area, only two being at eye level for passersby to easily see.  Plaintiff further alleges that one (1) no-smoking sign was placed on an on-property bench, sign being placed about two months after Agreement was signed, on advisement of Plaintiff.  Six (6) of the 10 signs were placed inside the ***no-smoking area*** (emphasis added) of Hayworth House, and all but one are nowhere in the proximity of Plaintiff's apartment.

30.   Plaintiff alleges that in a statement made to Plaintiff by Defendant HDSI, in defense of smoke from common areas drifting up to Plaintiff's front door and windows, was that Hayworth House had a *very good indoor ventilation system* for dissipating smoke. Plaintiff further alleges that Defendant, in making that statement, spoke for both Defendants as to their unwillingness to relocate Plaintiff substantially out of the movement of smoke and toxic inhalants into her dwelling, See:  Exhibit "F".

31.   Plaintiff states that she apprised Defendants of the inordinate amount of smoking by tenants and pedestrians in front of her dwelling and sent them photos. Plaintiff alleges that the Defendants' only solution in not providing her reasonable accommodations in another dwelling away from smoke and toxic inhalant pathways was to put up no-smoking signs in common areas near or away from her dwelling and inside the no-smoking areas of Hayworth House.  See:  Exhibit "L" pages 1-4; Exhibit "C".

31.   Plaintiff alleges that the Agreement is breached (See Exhibit "B"—Item 9), that both tenants and pedestrians continually persist in smoking on property and/or on property lines, and common areas, ignoring no-smoking signs, said smoke readily reaching Plaintiff's windows and front door.   Plaintiff further alleges that Defendants claim they cannot control smoking in front of her dwelling and in common areas, and Plaintiff states that placement of no-smoking signs is inordinately ineffective.   Plaintiff states that it is not her responsibility to become a 24/7 sentry of smokers in front of her dwelling, See:  Exhibit "L"1-4, Exhibit "C".

32.   Plaintiff further alleges that Defendants are acting with gross negligence in failing to allow her to move into a dwelling substantially away from pathways of smoke and toxic inhalants reaching her windows and doors, in direct violation of the following statutes, including but not limited to 42 U.S.C. § 3604(f)(1); 24 C.F.R. § 100.202(a)(1) (2012), 42 U.S.C. § 3604(f)(3)a); 24 C.F.R. § l00.204(a) (2012).

33.   Plaintiff alleges that she cannot open her windows at any time in an effort to let in outside air to ventilate her dwelling, except for her bathroom window, cracked to let steam out when she is not in it. Plaintiff further alleges that she regularly has fears that pedestrians are smoking near her dwelling, causing her emotional upheaval and undue stress, (See:  Exhibit "C").

34.   Plaintiff further alleges that according to her doctors' medical testing done over the last three years, her COPD has exacerbated. Plaintiff's further alleges that her doctors apprised Defendants of that fact along with some triggers that exacerbate COPD, including secondhand smoke. Plaintiff alleges that Defendants significantly

contributed to the exacerbation of her COPD by willfully exposing her to smoke and other toxic inhalants directly drifting into her dwelling,  (Exhibits A-1,-3,-5 and -7).

## VI.  THIRD CAUSE OF ACTION

35. Paragraphs 36 through 49 of this Complaint are allegations and claims in regard to Defendants willfully denying her reasonable accommodations in relocating her to a dwelling substantially off smoke and toxic inhalant pathways, allowing her to better manage her chronic lung diseases, at Hayworth House and/or any other West Hollywood low-income senior housing  Plaintiff further reiterates that she is Pro Se in this matter, has researched the Federal Rules of Procedure as a lay person, and the statements she makes are true, with some allegations being plausible.

36.   Plaintiff incorporates herein as Exhibit "C", her correspondence dated December 17, 2017, written to Defendants' attorney in response to his correspondence (Exhibit "D"), said exhibit serving as a reference, in part and/or its entirety, to this cause of action.

37.   Plaintiff alleges that Defendants ostensibly made their own diagnoses regarding Plaintiff's chronic lung conditions, while making unrealistic inferences, in defense of their not accommodating Plaintiff. Defendants inferred from Plaintiff's doctors' requests that Plaintiff required a totally *pollutant-free atmosphere (environment)*.  Plaintiff states that Defendants were referring to *atmosphere* as the *envelope of gases surrounding the earth or another planet.*  (Exhibits "A-3, "C" and "D"page 4.

38.   Plaintiff alleges that Defendants stated, in their denying Plaintiff any apartment in Hayworth House, that it would be *functionally impossible* to fulfill

Plaintiff's reasonable request considering a *dense urban setting such as West Hollywood*, that Defendants could not guarantee a *pollutant-free atmosphere (environment).*   Plaintiff further alleges that Defendant stated that it would pose an *undue burden* on them to furnish Plaintiff said atmosphere (environment), and thus Plaintiff's request was deemed as **unreasonable**, in direct violation of the following statues, including but not limited to 42 U.S.C. § 3604(f)(1); 24 C.F.R. § 100.202(a)(1) (2012), 42 U.S.C. § 3604(c); 24 C.F.R. § l00.75(a) (2012),42 U.S.C. § 3604(f)(2); 24 C.F.R. § l00.65 (2012).  See:  Exhibit "D", page 4).

39.   Plaintiff alleges that a pollutant-free atmosphere (environment) is virtually impossible to achieve, except if scientifically induced.  Plaintiff further alleges that per the EPA, inadequate ventilation can increase indoor pollutant levels by *not* bringing in enough fresh outdoor air to dilute emissions from indoor sources and by not carrying indoor air pollutants out of the home. Plaintiff further alleges that she cannot open her windows to ventilate her indoor air because of the outside smoke and toxic inhalants moving directly into her dwelling, (Exhibit "C").

40.   Plaintiff alleges that Defendants' solution to a *pollutant-free atmosphere (environment)* in her present dwelling was to supply her with two air purifiers that would sufficiently rid Plaintiff's indoor environment of pollutants, dust and dirt, thereby satisfying their legal responsibility to furnish her reasonable accommodations per the FHA. (Exhibit "C").

41.  As a matter of reference, Plaintiff's dwelling is a first-floor apartment, directly on a well-travelled street where smoke readily moves into her dwelling, including smoke coming from an on-property bench, and the property bordering it, along with

dust, dirt, and toxic inhalants from automobiles, garbage collection trucks, and street cleaners, substantially denying Plaintiff of the major life activities of breathing and sleeping.  Plaintiff further alleges that her doctors were referring to *toxic inhalants* as defined in this paragraph, and Defendant consistently put Plaintiff on the defensive as to defining her doctors' statements or recommendations.  See:  Exhibit "C".

42.  Plaintiff further alleges that Defendants, in denying her reasonable accommodations due to their not being able to guarantee a *pollutant-free atmosphere (environment)* in all of West Hollywood's portfolio of low-income senior apartments, including Hayworth House, gave Plaintiff alternatives as follows:  a) Allow her to breach her lease without penalty and *move out* and abandon her home entirely, or, b) place herself at the *bottom* of *any* open waitlist of another of property management's list of properties, all said buildings in Los Angeles proper, in direct violation of the following statutes, including but not limited to 42 U.S.C. § 3604(f)(1); 24 C.F.R. § 100.202(a)(1) (2012), 42 U.S.C. § 3604(f)(3)a); 24 C.F.R. § l00.204(a) (2012), 42 U.S.C. § 3604(f)(2); 24 C.F.R. § l00.65 (2012), 42 U.S.C. § 3604(c); 24 C.F.R. § l00.75(a) (2012) and 42 U.S.C. § 3604(c); 24 C.F.R. § l00.75(a) (2012).  See:  Exhibit "D", page 4, "Exhibit "C".

43.  Plaintiff alleges that Defendants, in offering her one other option if she would not want to completely move out and abandon her home, intimated that they were able to guarantee her a *pollutant-free atmosphere (environment)* in Los Angeles in that it does not have the *dense urban setting* that Defendants claimed West Hollywood does.

44.  Plaintiff alleges that Defendants made reference to their understanding of the federal laws regarding reasonable accommodations, making note that reasonable

accommodations do not have to pose an undue financial and administrative burden upon them. Plaintiff further alleges that Defendants had no such burdens placed upon them to preempt waitlists in any other West Hollywood low-cost senior allow apartment complex to accommodate her for better managing her COPD, specifically a dwelling that is significantly away from smoke and toxic inhalant pathways See:   Exhibits "D" page 2, and "C".

45.   Plaintiff had little knowledge of FHA statutes and regulatory provisions for the reasonable modifications at the time of negotiations.   Plaintiff alleges that when she suggested to Defendants that her present dwelling was not accessible as to structural defects and/or design defects in her kitchen, Defendants adamantly denied that there were said defects.   Plaintiff further alleges that her kitchen is minus one large bottom cabinet and another one that has only a 10" space in order to access it, leaving her with only half of the counter space in her kitchen, no bottom cabinet and a top cabinet that is not easily accessible,  (See Exhibit "M").

46.   Plaintiff alleges that in the negotiations for reasonable accommodations, Defendant HDSI exhibited harassment and a propensity toward humiliating Plaintiff, with abusive undertones, in its efforts to intimidate Plaintiff as to not *accepting* previously-offered apartments that were unacceptable to Plaintiff as to the management of her COPD and other chronic lung diseases, in direct violation of the following statutes, including but not limited to 42 U.S.C. § 3617; 24 C.F.R. § l00.400(b), (c)(l) and (c)(2) (2012), See:  Exhibits "E" and "F".

47.   Plaintiff further alleges that Defendants HDSI's proclivity in not acting in a timely manner was made obvious in its attempt to intimidate her, as made clear in

Defendants stating that they would *not* (emphasis added) offer Plaintiff another apartment at Hayworth House because it was an *undue burden and unreasonable*, (Exhibit "D" page 3).

49.    Plaintiff alleges that Item 2 of the Agreement is breached, Defendants having failed to advise Plaintiff of what she knows as vacancies within Hayworth House since Agreement was signed in February 2018. (Exhibit "B").

## VII.  FOURTH CAUSE OF ACTION

50.    Paragraphs 51 through of this Complaint are allegations and claims in regard to Defendants willfully entering into an illegal contract with a potential tenant, while adamantly refusing to preempt waitlists for Plaintiff in any West Hollywood low-income senior apartment.   Plaintiff further reiterates that she is Pro Se in this matter, and has researched the Federal Rules of Procedure as a lay person, and alleges that she has firsthand knowledge that Defendants are participating in illegal conduct.

51.    Plaintiff alleges that Defendant HDSI accepted a tenant for occupancy in Hayworth House in August 2015, with Defendant's complete knowledge that said potential tenant was not on the waitlist and is an employee of an illicit drug distributor while willfully engaging tenant into an illegal contract.

52.    Plaintiff alleges that Defendant HDSI had knowledge that said potential tenant was a drug distributor's employee and that said tenant falsified her employment and financial records in order to live in a federally-assisted apartment complex, as related to Plaintiff by tenant  (See:  Exhibit "K", page 2 — Item 1).

53.    Plaintiff alleges that said tenant related to her that she *bribed* Defendants' onsite manager, *a friend of her boss*, to live in Hayworth House, a HUD-assisted

apartment complex. Plaintiff further alleges Defendants were adamant about **not** (emphasis added) accommodating her with another dwelling within Hayworth House as a reasonable accommodation, due to their inability to furnish Plaintiff a pollutant-free atmosphere (environment), while Defendants willfully accepted a drug distributor's employee to live in the complex, in direct violation of the following statutes, including but not limited to 42 U.S.C. § 3604(f)(3)a); 24 C.F.R. § I00.204(a) (2012).

## VII.  FIFTH CAUSE OF ACTION

54.  Paragraphs 55 through 60 of this Complaint are allegations and claims in regard  to Defendants condoning the actions of a tenant who assaulted Plaintiff under the influence of a psychoactive drug, by not initiating tenant's eviction. Plaintiff further reiterates that she is Pro Se in this matter, and has researched the Federal Rules of Procedure as a lay person, and she is making statements of fact, with allegations that are plausible.

55.  Plaintiff alleges that on August 21, 2017, a tenant living in Hayworth House assaulted Plaintiff in a maniacal rage by pushing his way into Plaintiff's apartment by overcoming her with his strength and accosting her.

56.    Plaintiff alleges that tenant previously told her that he is addicted to psychoactive drugs, starting use when he was a teenager and continuing up to his present 72 years of age.  Plaintiff further alleges that Defendant Hayworth House, LP was made aware of tenant's drug possession and use by Plaintiff, and it refused to initiate action against him for eviction after tenant accosted Plaintiff.

57.  Plaintiff alleges that Defendant Hayworth House, LP is taking on the same attitude as the West Hollywood Sheriff's Department in condoning the use and

possession of drugs in a HUD-assisted building since it is **legal in California,** by not causing the eviction of a the said tenant after assaulting Plaintiff under the influence of drugs.

58. Plaintiff alleges that nobody at Hayworth House witnessed said crime, but two security cameras facing Plaintiff's apartment recorded tenant's actions as to pushing his way through her door in a rage.   Plaintiff further alleges that when she alerted Defendants' onsite manager that Sheriff's detectives were coming to observe tenant's actions on the camera tapes, he apprised Plaintiff that the tapes were *taken away* by the security company.

59.   Plaintiff alleges that Defendants' onsite manager willfully and maliciously lied to her in his efforts to protect tenant from likely prosecution and subsequent eviction, with Plaintiff having knowledge that said security cameras work on an infinity cycle, leaving the security company *out of the loop*.   Defendants' onsite manager admitted to *destroying evidence* that was necessary for Plaintiff to immediately press charges against tenant, thereby Defendants' onsite manager participating in the *obstruction of justice*.

60.  Plaintiff alleges that said assault was a breach of peaceful enjoyment as set forth in her lease, coupled with elder abuse.  Plaintiff further alleges that she continues to undergo emotional distress by anticipating the event that she may come in close proximity of said tenant in building's common areas.

## VIII.  SIXTH CAUSE OF ACTION

61. Paragraphs 62 through 75 of this Complaint are allegations and claims in regard to her being asked for past due rent which she alleges has not been paid in full

or part since the beginning of her tenancy until present. Plaintiff reiterates that she is Pro Se in this matter, and has researched the Federal Rules of Procedure as a lay person, and is making statements of fact, with the allegations plausible in regard to Defendants illegal conduct.

62. Plaintiff states that she incorporates herein as Exhibit "C", her correspondence dated December 17, 2017, written to Defendants' attorney in response to his correspondence (Exhibit "D"), said exhibit serving as a reference, in part and/or its entirety, to this cause of action.

63. Plaintiff alleges that she was threatened by Barker, the new management company beginning August 2018, that she would be served a 3-day Notice to Pay August and September rents. Plaintiff further alleges that said advisement of nonpayment is causing her undue stress and emotional upheaval (Exhibit "H").

64. Plaintiff alleges that she signed her lease for Hayworth House in May 2012 with Defendant HDSI, and was thereupon shown an email sent to Defendant HDSI's Occupancy Director, stating that $300 of the $341 of Plaintiff's monthly rent would be paid by Perla Eston, Plaintiff's cousin.   Said email of proof has subsequently been declared as **nonexistent** by HDSI.

66. Plaintiff alleges that during negotiations for reasonable accommodations, Defendant HDSI claimed, in an effort to intimidate Plaintiff, that Eston paying Plaintiff's rent was not Defendant's and Eston's arrangement, it was Eston's and Plaintiff's agreement, **however**, (emphasis added) the *rent checks were being sent to HDSI by Eston* rather than by Eston to Plaintiff to add on the additional $41 (Exhibit "F").

66.   Plaintiff alleges that Defendant HDSI has no viable reason to deny its arrangement with Eston along with the receipt of the email stating Eston's intentions to pay Plaintiff's rent. Plaintiff further alleges that she herself has no reason to lie about said arrangement, and therefore Defendant desires to put Plaintiff in a precarious position as to explaining where her rent payments are coming from. (Exhibit "C").

67.  Plaintiff alleges that Defendant HDSI's denial of receiving said email, while maintaining that Plaintiff is lying about it, makes it evident that HDSI is passing the rent issue over to Plaintiff.  Plaintiff further alleges that said statement as to HDSI's illegal conduct is predicated on the fact that she was threatened for payment of two-months' back rent payments, indicating that there were no payments made by Eston.  (Exhibits "C", "F" and "H").

68.   Plaintiff further alleges that Eston related to her that she has known HDSI's Ward for over 25 years, and Eston was most probably apprised of Defendant HDSI's contract cancellation with Hayworth House, LP; or, in the alternative, Eston has been sending Plaintiff's rent checks to Defendant HDSI, as Defendant claims she has for the last *5-1/2 years*, with HDSI forwarding the checks to Barker Management. (Exhibits "C" and "F").

69.   Plaintiff alleges that she has never been asked for the additional monthly $41, has never received a receipt for payment of her rent, and has never received notices of eviction since her tenancy beginning May 2012.  Plaintiff further alleges that the first indication that her rent had not been paid was when Barker threatened her with a three-day notice to pay. (Exhibit "H").

70. Plaintiff alleges that Defendant HDSI offered unacceptable apartments within Hayworth House, but said offers were conditional upon Eston paying $341 of the rent, giving Plaintiff no other alternatives, See:  Exhibit "F"

71.   Plaintiff further alleges that Defendants alluded to having an unreleasable hold on her in regard to their agreement with Eston, and Defendants have caused her undue emotional pain, distress, frustrations and stress in their refusal to provide the reasonable accommodations that she requested. Plaintiff further alleges that she feels helpless in her inability to convince Defendants that she needs both onsite parking and a dwelling away from the path of smoke and toxic inhalants for her health and safety. (See:  Exhibit "C")

72.   Plaintiff alleges she can acquire no information from either the CEO of the agent of Defendant Hayworth House, LP, or the onsite manager who now collects the monthly rent checks and deposits them into the Management Account for Hayworth House.  Plaintiff further alleges that the CEO suggested that she drop it since she has not been served with an eviction notice since her tenancy.

73.   Plaintiff alleges that Defendants' persistence in suggesting that it would allow her to breach her lease, move out and abandon her home, or move into one of HDSI's portfolio of apartments in Los Angeles, was orchestrated by Defendant HDSI, in its role in managing Eston's *rent payments* easily with no questions asked, with the best possible solution being to coerce Plaintiff into moving out altogether.  Exhibit "C".

74.   Plaintiff alleges that an Item was entered into the Draft Agreement stated that it was her responsibility to pay rent in a timely manner, which Plaintiff did not accept.   Plaintiff further alleges that Defendants were acting in a fallacious manner in

making said statement, that Plaintiff would not notice said inclusion, and sign the agreement as is.  Plaintiff further alleges that she indicated Eston was paying the rent in correspondence to both Defendants and Defendants' attorney, and verified by Defendant HDSI, thereby reenforcing Plaintiff's position stated in this paragraph. Exhibits "F", "C" and "I" — Item 13.

75.  Plaintiff alleges that she has been emotionally distraught regarding the question about her rent and not being able to ascertain any real information about same. Plaintiff further alleges that said rent issues have caused her both adverse physical symptoms and emotional upheaval.

## XI. SEVENTH CAUSE OF ACTION

76.    Paragraphs 77 through of this Complaint are allegations and claims in regard to Defendants willfully and wantonly taking undue advantage of her as to her being Pro Se and not being versed in FHA law.  Plaintiff further reiterates that she is Pro Se in this matter, and has researched the Federal Rules of Procedure as a lay person, and she is making statements of fact, with some allegations being plausible.

77.  Plaintiff states that she incorporates herein as Exhibit "C", her correspondence dated December 17, 2017, written to Defendants' attorney in response to his correspondence (Exhibit "D"), said exhibit serving as a reference, in part and/or its entirety, to this cause of action.

78.  Plaintiff alleges that Defendants took undue advantage of Plaintiff's tenuous physical condition, coupled with her extreme emotional pain, as to her being Pro Se counsel in the negotiations for reasonable accommodations. Plaintiff further alleges that Defendants caused her mental anguish and temporary high blood pressure (Exhibit

A-6) along with having to cope with her chronic lung diseases, in the negotiations for reasonable accommodations.

79.   Plaintiff alleges that said negotiations for reasonable accommodations spanned mostly over the 2017 Thanksgiving and Christmas holidays, giving way to Plaintiff's complete emotional upheaval and unbearable grief in having to endure said holidays by herself, coupled with having to defend both hers and her doctors' requests for reasonable accommodations as Pro Se.

80.   Plaintiff alleges that Defendants coerced her into accepting what was their interpretation of reasonable accommodations according to federal statutes and regulatory provisions, and essentially disregarding both her medical and emotional needs.  Plaintiff further alleges that she had no other option but to rely on Defendants' attorney's knowledge of fair housing laws, thereby Plaintiff having no other choice than having to relent and acquiesce,  (Exhibits A-1 through 7,  Exhibit "C".

81.   Plaintiff alleges that she has been living in her present apartment for over six years and was diagnosed with COPD in March 2015. Plaintiff further alleges that since the onset of her COPD, Defendants denied her a dwelling that is substantially away from the movement of smoke and toxic inhalants, with the exception of one that would be impossible for her to lease without Eston's *help*.

82.   Plaintiff alleges that both she and her doctors showed Defendants the nexus between her disabilities and the reasonable accommodations necessary to allow her to better manage her COPD, and Defendants willfully and wantonly denied her reasonable accommodations while blatantly ignoring said statements regarding the nexus between her tenuous lung conditions and the need for accommodations in a

dwelling substantially away from smoke and toxic inhalant pathways and onsite parking. (Exhibit "C").

84.   Plaintiff alleges that Defendants willfully and blatantly ignored referencing two detailed requests and explanations from her doctors, (Exhibits A-1, A-4), most importantly, one from her primary physician, who asked that Plaintiff has to be moved into a more suitable dwelling to better manage her chronic lung diseases (Exhibit "D", pages 1-2).

85.   Plaintiff alleges that the negotiations for reasonable accommodations between Plaintiff and Defendant took an inordinate amount of time, exactly four (4) months, before the Agreement was signed, said time suggestive of Defendants denying Plaintiff reasonable accommodations, a direct violation of the Fair Housing Act, § 804(f)(3)(B), 42 U.S.C.A. 3604(f)(3)(B).


## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff demands compensatory and punitive damages against Defendants individually, jointly and severally, in an amount in excess of $7,000,000 (Seven Million Dollars), court costs and fees, reasonable attorney's fees, if applicable, and any other relief this Honorable Court deems just and equitable, to the following:

a) Defendants' gross negligence of their willful and wanton acts in disregarding Plaintiff's chronic lung diseases, including but not limited to COPD, by denying her reasonable accommodations, thereby contributing to the exacerbation of her chronic lung diseases;

b) Defendants' gross negligence in their willful and wanton acts of denying Plaintiff the major life activities of breathing and sleeping (list not exhaustive), in contributing to Plaintiff's poor quality of life;

c) Defendants' gross negligence in denying Plaintiff reasonable accommodations by violating multiple FHA statutes and regulatory provisions set forth in this Complaint on page 2, Items (a) through (i);

d) Defendants' gross negligence in participating in illegal conduct defined as:  a) the obstruction of justice, denying Plaintiff her individual rights as a citizen; b) willful and wanton acts of discrimination against Plaintiff in denying her reasonable accommodations for onsite parking; c) willful and wanton acts in denying Plaintiff peaceful enjoyment as to the equal use and enjoyment of her dwelling; and, d) willful and blatant discrimination in denying Plaintiff any and all housing within West Hollywood's portfolio of low-income senior housing, up to and including their refusal to preempt waitlists.

Respectfully submitted this 4 day of December, 2018

                                        _Deborah Conner Scott_
                                        Deborah Conner Scott
                                        Pro Se


Deborah C. Scott, Pro Se
1234 N. Hayworth Avenue, #124
West Hollywood, CA 90046
310.500.9593

*EXHIBIT "A-1"*

 **KAISER PERMANENTE.**

Deborah C Scott
1234 N Hayworth Ave Apt 124
West Hollywood CA 90046-5481

10/6/2017

RE: Deborah C Scott
DOB 01/21/1944

To whom it may concern,

Ms. Scott is currently under my medical care. She has a chronic lung condition
that is exacerbated by smoke and other air impurities. In her current apartment,
the air quality is not only exacerbating her lung disease, it is also causing poor
sleep. Her bedroom does not have a door so she cannot experience the benefits
of an air purifier which she needs for her lung condition. Please accommodate
her to move to another apartment so that these medical needs can be met.

Sincerely,

Amanda Mazza, MD
Department of Internal Medicine
Southern California Permanente Medical Group
1-800-954-8000

Amanda Mazza, M.D
Kaiser Permanente Medical Group
3280 E. Foothill Blvd.
Pasadena, CA 91107
1-800-954-8000

EXHIBIT A-2

## 🐘 KAISER PERMANENTE

10/30/2017

To Whom It May Concern

RE: Deborah C Scott

The patient has been diagnosed with a hair loss condition called telogen effluvium. This condition is characterized by hair loss which occurs from significant stressors in the patient's life, both health and psychosocial triggers. If the stressor is not treated or removed, the patient can enter chronic telogen effluvium with continued hair loss. Chronic medical conditions such as COPD as well as significant life stressors may be contributing to Ms. Scott's alopecia.

Please accept this letter as documentation of the patient's condition and recommendations for improving her hair loss.

Sincerely,

YOUNG MIKE CHOI MD

Kaiser Permanente Medical Center

This information has been disclosed to you from records whose confidentiality is protected by Federal law.  Federal regulations prohibit you from making any further disclosure without the specific written consent of the person to whom it pertains, or is otherwise permitted by such regulations.

EXHIBIT "A-3"

 KAISER PERMANENTE.

Deborah C Scott
1234 N Hayworth Ave Apt 124
West Hollywood CA 90046-5481

11/29/2017

RE: Deborah C Scott
DOB 01/21/1944

Dear Ms. Conerly,

Please refer to my letter dated October 6, 2017. Ms. Scott is currently under my
medical care and has COPD which is a chronic lung disease that is irreversible
(i.e. No cure). She has chronic bronchitis (a form of COPD) which manifests as
inflamed bronchial tubes, chronic cough, and mucus production. She also has
MAC (an infection with an atypical bacteria called mycobacterium avium
complex). This condition can cause cough, fever, weight loss and fatigue. If it
progresses, it must be treated with prolonged courses of antibiotics. Lastly, Ms.
Scott also has bronchiectasis, another condition of the bronchial tubes that is
chronic and irreversible. This condition also leads to chronic cough, scarring in
the bronchial tubes, and impaired lung functioning.

COPD, bronchiectasis, and MAC can be managed both with medication and
avoiding exacerbating factors. Both I and Ms. Scott's pulmonary specialist have
worked hard to put her on a medication regimen to control her diseases, but the
exposure to air pollution, fumes, and secondhand smoke due to the location of
her apartment has exacerbated her symptoms, making it difficult to control her
lung conditions. Ms. Scott's health is my top priority and I ask that you please
accommodate her request to relocate to an apartment that provides good
ventilation, and does not expose her to air pollutants of any kind.

Sincerely,

Amanda Mazza, MD
Department of Internal Medicine
Southern California Permanente Medical Group
1-800-954-8000

**KAISER PERMANENTE.** EXHIBIT A-4 "

10/24/2017

RE: Deborah C Scott
1234 N Hayworth Ave Apt 124
West Hollywood CA 90046-5481

To Whom it May Concern:

Ms. Scott has been seen in our department since Jan 2016. She has a diagnosis of Major Depressive Disorder and Panic Disorder.  She has expressed to me that she does not feel safe in her environment when walking home.  This causes fear and anxiety for her, and coupled with her physical condition, COPD, can exacerbate her symptoms. She would benefit from a parking space within  her place of residence.

Sincerely,


Le Notarfrancesco, MD
Psychiatry Department
4700 Sunset Blvd
Los Angeles, CA 90027
Tel.323-783-2600


This information has been disclosed to you from records whose confidentiality is protected by Federal law.  Federal regulations prohibit you from making any further disclosure without the specific written consent of the person to whom it pertains, or is otherwise permitted by such regulations.

EXHIBIT "A-5"

 **KAISER PERMANENTE.**

10/31/2017                              MR#000021890172

Re: Deborah C Scott
1234 N Hayworth Ave Apt 124
West Hollywood CA 90046-5481

To whom it may concern,

Ms. Scott is currently under my medical care. She has several lung conditions
that can be exacerbated by a variety of exposures.  She has chronic obstructive
pulmonary disease (COPD), bronchiectasis and mycobacterium avium complex
colonization.  Due to these conditions, I would recommend the following:
park in the parking structure on the premises of her apartment building, eliminate
exposure to cigarette smoke/other pollutants, avoidance of extreme temperature
changes, limitation of certain movements (bending over, reaching for objects).
Her health status is very tenuous and has worsened by continued exposure.

Please accept this letter as documentation of my patient's health condition and
recommendations for improving her health.

Sincerely,

*Tina Chou* MD

TINA R. CHOU MD
Pulmonary and Critical Care Medicine
1515 N Vermont Ave
Los Angeles CA 90027-5377
323-783-4011

**KAISER PERMANENTE.** *EXHIBIT "A-6"*

Deborah C Scott
1234 N Hayworth Ave Apt 124
West Hollywood CA 90046-5481


12/21/2017

RE: Deborah C Scott
DOB 01/21/1944

To whom it may concern,

Ms. Scott is currently under my medical care. She has a history of hypertension.
She has been on medication to manage this in the past, but was able to come
off medication with exercise and stress reduction. Due to her recent stressors
related to housing, her blood pressure has risen and she is being monitored to
see if medication is again needed. I have expressed to Ms. Scott that I believe
she could control this with stress reduction. I ask that you please assist Ms.
Scott with the needed accommodations related to her housing.

Sincerely,


Amanda Mazza, MD
Department of Internal Medicine
Southern California Permanente Medical Group
1-800-954-8000

EXHIBIT "A-7"

 **KAISER PERMANENTE.**

6/18/2018

Deborah C Scott
1234 N Hayworth Ave Apt 124
West Hollywood CA 90046-5481

RE: Deborah C Scott
DOB 01/21/2944

To whom it may concern,

I am writing as follow-up to my letter on October 24, 2017. Ms. Scott is currently under my medical care. She has a chronic lung condition that is exacerbated by smoke and other air impurities. Additionally, she has a history of anxiety disorder, now well controlled. Due to both of these conditions, I would recommend she be able to park in the parking structure on the premises of her apartment building, both for her lung health, and for her mental well-being. Please accommodate this request.

Additionally, the patient has had pain in the right hip since July 2017. She has been evaluated in the office for this complaint in July 2017, August 2017, April 2018, and June 2018. An x-ray confirmed the presence of osteoarthritis of the hip. Because of her ongoing hip pain from osteoarthritis, I ask that you please accommodate the request for a parking space in the parking structure where she resides.

Sincerely,

Amanda Mazza, MD
Department of Internal Medicine
Southern California Permanente Medical Group
1-800-954-8000



EXHIBIT "B"

## ACCOMMODATION AGREEMENT

It is hereby agreed by and between HDSI Property Management and Hayworth House, L.P., a California Limited Partnership (collectively "Landlord") and Deborah C. Scott ("Resident") with regard to the real property located at 1234 N. Hayworth #124, West Hollywood CA 90046 (the "Property").

### RECITALS

A.  Landlord and Resident are parties to a residential lease agreement for the Property (the "Lease") for the Property. The Property is a residential, single room occupancy unit located at the Hayworth House Apartments (the "Apartment Community"), which are owned and managed by Landlord.

B.  During Resident's tenancy, Resident has requested a variety of accommodations and/or modifications to the Property and claimed they are necessary due to Resident's medical conditions.  Landlord has interpreted these requests as requests for accommodation and/or modification under federal/state fair housing laws.

C.  The parties have engaged in an interactive dialogue to find reasonable resolutions which meet Resident's disability-related needs.

D.  As an accommodation for Resident's disabilities, the parties agree to the following:

### AGREEMENT

1.  The above-referenced recitals are incorporated by reference herein.

2.  Landlord shall permit Resident to transfer to any other single-room occupancy unit or one-bedroom unit at the Apartment Community, otherwise comparable in amenities to the Property, subject to availability and upon confirmation that Resident meets any affordable housing program requirements relevant to such a unit.  Landlord agrees to notify Resident of the availability of such units at the Apartment Community as they become available, and permit Resident to tour such units at a mutually-agreeable time.  If Resident agrees to transfer to such a unit, and Landlord confirms that Resident meets all affordable housing program requirements for such a unit, Landlord shall agree to transfer Resident to such a unit. Rent for any unit to which Resident transfers will be established based on affordable housing programs applicable to that unit.

3.    Landlord agrees to re-grout the Property's bathtub as a courtesy, at Landlord's expense.  The parties agree that Landlord cannot at any time absolutely guarantee that the bathtub, the Property, and/or Apartment Community will at all times be free of all mold and/or mildew.

4.    Landlord agrees to raise the level of the Property's bathroom sink and medicine cabinet to a level identified by Resident to Landlord.  Landlord agrees to complete this as a reasonable modification for Resident's disabilities, at Landlord's expense.

5.    Landlord agrees to install a window-mounted air conditioner/heater combination in one of the Property's exterior windows adjacent to the Property's sleeping alcove.  Landlord agrees to complete this as a reasonable modification for Resident's disabilities, at Landlord's expense.

6.    Landlord shall install a towel rack in the Property's bathroom, to the left of the bathroom door. Landlord agrees to complete this as a courtesy to Resident, at Landlord's expense.

7.    Landlord shall install slatted doors which are flush with the Property's ceilings and floors, between the Property's master bedroom, kitchen, dining room, and living room areas.  Landlord shall complete this as a reasonable modification for Resident's disabilities, at Landlord's expense. Photos of comparable doors are attached hereto as Exhibit A and incorporated by reference herein.

8.    Landlord shall also replace the Property's two closet doors with doors which aesthetically match the slatted, pocket doors referenced in Agreement Article 7, above. Landlord agrees to complete this along with the modification listed in Article 7 as a courtesy.  Resident agrees to be financially responsible for repaying Landlord for the costs of replacing the small closet door, while Landlord will be financially responsible for replacement of the large closet door. Resident also confirms that replacement of the closet doors is not necessary due to any disability.

9.    Landlord agrees to continue enforcing the Apartment Community's smoke-free policies. Landlord agrees to install ten (10) signs in the Apartment Community's common areas (including a small patio area near the Property), which indicate the Apartment Community is a smoke-free facility.  Landlord shall have sole discretion as to the content, location, and/or design of these signs.

10.   Landlord shall supply Resident with two (2) portable HEPA-filtered air purifiers, as an accommodation to Resident. Resident agrees to provide Landlord with a make and model of the desired air purifiers. The parties

further agree that the per-unit cost of the air purifiers shall not exceed $200.00.

11.    Landlord shall install Resident on the wait list for a parking space in the Apartment Community's exclusive use parking lot.  The parties agree that no parking spaces are currently available, that other residents are currently on the Apartment Community's parking waitlist as reasonable accommodations which pre-date Resident's request, that Resident is currently fourth on the waitlist for parking, and that Landlord cannot reasonably predict when a parking space will be available for Resident. Once Resident reaches the top of the Apartment Community's waitlist, Landlord will notify Resident of the same and permit Resident to inspect the available parking space. If Resident concludes the parking space in question will meet her needs, Landlord shall assign that space to Resident. If Resident concludes the parking space does not meet her needs, Landlord shall at that time maintain Resident's status atop the waitlist, assign the parking space in question to the next resident on the waitlist, and notify Resident if and when another parking space becomes available.

12.    Landlord will purchase, assemble, and install in the Property two freestanding cabinets and one freestanding, mobile kitchen island. Landlord agrees to complete this as a reasonable modification for Resident's disabilities, at Landlord's expense.  Photos of the aforementioned cabinets and kitchen island are attached hereto collectively as Exhibit B and are incorporated by reference herein.  As a one-time courtesy to Resident, Landlord shall paint the two cabinets and mobile kitchen island for Resident, with Resident agreeing to supply Landlord the paint in question at Resident's expense.

13.    Landlord agrees to install shelving in the Property's small closet to a level identified by Resident to Landlord.  Landlord agrees to complete this as a reasonable modification for Resident's disabilities, at Landlord's expense.

//

//

//

//

//

//

//

14.    The parties agree that this Agreement constitutes full compliance with all Resident's requests for disability accommodation and/or modification as required under all federal and state fair housing laws and that no remaining accommodation/modification requests are currently outstanding.


_Deborah C. Scott_
Deborah C. Scott
Resident

_February 8, 2018_
Dated


HAYWORTH HOUSE, L.P.
HDSI PROPERTY MANAGEMENT

_Walter Maynard_
Landlord
By:   Walter Maynard
Its:   Authorized Agent

_2/9/2018_
Dated

Exhibit A









12/17/17                        EXHIBIT "C"                        Page 1 of 8

Mr. Bankson:

I have cut and pasted the letter to this email.  Hard copy on the way today.  Regards.

Deborah C. Scott
1234 North Hayworth Avenue
Apartment 124
West Hollywood, CA  90046

December 17, 2017

BY US MAIL AND E-MAIL
Shawn W. Bankson, Esq.
Kimball, Tirey & St. John LLP
2300 Clayton Road
Suite 1350
Concord, CA  94520

Re:  Requests for Accommodations and Modifications

Dear Mr. Bankson:

I am in receipt of your letter dated December 11, 2017, which I received by USPS yesterday, December 16.  I appreciate your adhering to my wishes during your time off as to your office forwarding a hard copy.

*Pro Se*

I have talked in length with my attorney regarding this matter, and we both agree that since I am closer to the situation which includes firsthand knowledge of your clients' actions as well as, of course, knowing firsthand what my medical needs and conditions are, that it is in all of our best interests to answer your letter personally.  Additionally, I do not have to mention that my replying to you personally will also save an inordinate amount of time and money.

*Disclaimer*

Regarding our position on your clients' providing me reasonable accommodations,  I will neither accept nor reject any or all of the terms and conditions for modifications to Apartment 124 that your clients' propose, with reference to my physicians' request to change my location to another apartment, and the final determination will be that of my primary care physician (Amanda Mazza, MD) and my pulmonary specialist (Tina Chou, MD) as to both my chronic and treatable medical conditions.

*HDSI*

Moreover, I want to stress that your clients' representatives, Mses. Ward and/or Preston, have repeatedly sent me correspondence that is of a very aggressive and belligerent nature, along with ridiculous and unrelated examples as to meeting my doctors' recommendations in offering me other unacceptable apartments.  If I did not know better, I would have to say that they were purposely trying to intimidate me with their unnecessary remarks.  Moreover, my having to answer to their insolent, disrespectful comments has not only caused me undue stress, but it has also caused my blood pressure to rise to high levels.  Dr. Mazza will reconfirm this, but I asked that if they had any further questions, concerns or insolent and impertinent comments, to please direct them to my PCP.  This was my doctor's suggestion as she is very tuned into what is happening and how it affects my health and well being.

*FHA*
*Secondhand*
*Smoke*

As to the Fair Housing Act and ADA, I am familiar with both as much as a lay person can possibly be.  I know that both only address handicaps and disabilities, as to "reasonable accommodations" generally rather than specifically.  The point is that the most drastic triggers for COPD, bronchiectasis and MAC are secondhand smoke and air impurities; and, it would be

*SMOKE and TOXIC INHALENTS*

virtually impossible to have all the modifications I need in this apartment and still breathe in fresh air. Moreover, when I am outside, I avoid smokers and/or cover my mouth and nose while in smoke airways. Here, with the many tenants smoking outside my window, it is impossible to escape from the smoke drifting into my open windows. That is to say, when I discover smoke coming into an open window, it is too late, as I inhaled the fumes and they already have gone into my lungs. Therefore, medically speaking, this apartment is totally inadequate as a whole as to being a reasonable accommodation. It is right on the street where there are toxic fumes floating in, not to mention street cleaners each week, along with garbage trucks. Additionally, management has failed to cease tenant smoking on property directly in front of my windows, on the bench and small patio directly in front of my apartment, and on the bench on property directly in front of the main patio. When the wind is just right, I can smell fumes from cigarettes coming all the way to my front door area from said bench.

*reasonable Accoms.*

Before I address the content of your letter, I want to strongly emphasize that modifications to this apartment will bring about dust, dirt and impurities brought about by drilling and whatever workers do to get the job done. It obviously was not your clients' consideration that I cannot breathe in any dust and residue caused by workers if they make modifications to this apartment. I will not be put out of my own home for the benefit of your clients who are purposely trying to avoid moving me into another apartment as per my doctor's requests, and the modifications to this apartment would cause your clients an additional problem.

Regarding my requests:

*LIST*

I did request that the level of my bathroom sink to be raised;
I asked for both countertops to be raised in the kitchen, not just one;
I did ask for my closet door to be replaced with a slatted door, flush with top and floor;
I did not ask for a folding door between the kitchen and bedroom, I requested the same type of slatted door similar to the closet, flush with ceiling and floor;
I did not request a folding door between the kitchen and living area, I requested the same type of slatted door similar to the closet, flush with ceiling and floor;
i did request a wall-mounted air conditioner/heater be installed in the bedroom area;

*AIR PURIFIERS*

As to air purifiers, the benefit of air purifiers only applies if the surrounding area is small enough to cover all the impure air. If fresh air is coming through a cracked window in the fall/winter, a purifier is able to take in the air and purify it. That is the reason for the room dividers or a closed-in bedroom separated by a walls and a door (please refer to Dr. Mazza's letters);
Regarding the parking space, please refer to the paragraph written below;
Regarding being moved to another place other than Hayworth House, please refer to the paragraph written below.

*IMP. - EXPLAINING NEXUS*

In reference to my doctors' letters requesting accommodations for me, they are specifically addressing the medical reasons why reasonable accommodations would be beneficial for the management of my chronic diseases; additionally, to reiterate, due to the undue stress your clients have placed upon me because of their inane, disrespectful and highly aggressive way of handling this situation, we can add high blood pressure to the list. This was brought up to me by Dr. Mazza, and should you require yet another letter, she will be glad to furnish it.

*REASONABLE ACCOM. COPD*

Regarding your clients' interpretation of the law, I understand that my reasonable requests must not impose undue financial and/or administrative burden upon them. However, they did impose an undue burden upon me by denying my doctors' the right to effectively manage my chronic diseases, without your clients blatantly ignoring my medical issues, and their failing to control my living environment. That is to say, I would request that your clients explain to me, in writing only, why my COPD has gone from mild to intermediate within the last two or more years, while they persistently dawdled with ridiculous and inane reasoning, along with entirely avoiding the real issues (my medical conditions). The aforesaid statement is known as a reasonable request

in my book.  I have medical proof that my conditions have exacerbated, thanks to your clients, and my doctors are completely exasperated (not to be confused with "exacerbated") as to finding my conditions have recently worsened.  Please reference Dr. Mazza's latest letter once again.

*EXACERBATING COPD*

All that being said, I have no sympathy for management and admin for basically having to reach into the coffers and "overspending" on me.  However, I do have sympathetic feelings for myself for having a chronic disease that could have been mild, thanks to my doctors' efforts, but of no concern to your clients as substantiated in their hesitancy to move on my behalf.  In essence, it appears that your clients are merely concerned about their own pocketbook and the little money that they must put into this, up to and including putting me into another apartment conducive to the management of my disabilities.  In just two words, that is truly disgusting.

*NEXUS*

In regard to your clients having the right, under law, to have written verification of a disability and disability-related needs for accommodation/modification when they are not readily apparent, I am unsure as to what you are referring.  Inasmuch as my doctors have specifically asked that I be placed away from the street and toxic impurities,  which includes secondhand smoke, your clients have been balking at taking that action for years now.  Please reply to me, in writing only, specifically what written verification you are needing.

*DISCLAIMER HDSI*

To reiterate my initial statement, in regard to your clients' positions, please be advised that I am willing to accept or reject modifications, but only with my doctors' positions in mind that I need to be in a living environment away from the street, toxic fumes and secondhand smoke. On that understanding only will I sit down and have a dialogue, even a mediation, with them, and basically map out these so-called modifications that your clients either will or will not agree to, up to and including another apartment conducive to the management of my disabilities. Furthermore, due to the aggressive nature and unbusinesslike manner of above-mentioned HDSI representatives, I refuse to have any personal contact with them in any way.     That is known as a serious statement and/or reasonable request.

In regard to modifications to the bathroom sink and kitchen counters, etcetera, I can only add that I did not request "folding" doors per se. Please refer to the picture attached to this letter;

Air Conditioner/Heater:  I have been requesting this for years inasmuch as the AC/heater in my living area can be on all night, with the heat or cool air not reaching my bedroom area at all.  Not only is this a waste of electricity, it is costly.  However, the biggest issue here is that I take exception to your clients' position that I denied them the offer to install a second "heater/air conditioning unit" in the side bedroom window. In fact, I will go one step further to say that their position is based on an out and out lie.  Mr. Gritsenko offered to install just an air conditioner (and not a heater) in the side window of my bedroom, at my expense.  And it would only cost "$100 or so."   I have a witness to this effect, if this witness, also a tenant, can possibly remember this particular incident.  In that I will have to add that this person has a French fried brain due to the long-term effects of doing daily pot for 55 or so years, I have reservations that he would remember this particular event, if any, up to and including what he had for dinner last night. However, I can verify the fact, and I strongly suggest that either Mr. Gritsenko possibly forgot this dialogue or he has memory lapses as well.  I do not.

*LIES RE GRISTENKO*

Regarding verification for the necessity for an AC/heater unit that is not attached to a window, I am going to once again bring up the blatant lie that I refused an AC/heater, window-mounted or not. Please refer to the above paragraph. Further, inasmuch as if I must endure the smoke and other air pollutants coming in from outside of my front windows, thereby causing further damage to my lungs, the window on the side of the so-called "bedroom" is the only one that is not on the street; and it may be possible to keep the window cracked during cooler weather to help the air purifiers along with the so-called fresh air.  Inasmuch as there is no possibility of putting  in a

*LIES Y POLLUTANTS*

wall-mounted unit on that wall (and I have heard no reason from you as to why), the building, in my opinion, has to be structured for installation of a wall-mounted unit on the outside wall facing the street.  In that it is not structured to hold a wall-mounted unit, then that is another hands-down reason that I must be relocated.

Regarding the two phantom vendors who have assessed my bedroom wall, I have not seen them doing their assessment in any way, shape or form.  In any event, I will gladly enter into a dialogue with the vendors themselves as to the position we take that the outside wall is structured to take a wall-mounted AC/heating unit.  Please refer to any information on COPD as to why heating and air conditioning is necessary to a patient, including the fact that extreme temperatures as well as high and low humidity have adverse effects on that condition. Moreover, window-mounted units cause excessive noise, and my suggestion to you is that you surf the internet as to why COPD patients, due to abnormal breathing and lung functionality, thereby causing exhaustion, cannot have noise of any kind that interrupts nighttime sleep. Or, I recommend that you reread all three of Dr. Mazza's letters along with Dr. Chou's.

*COPD- MAJOR LIFE ACTIVITY*

Regarding your clients' possible undue financial strains and administrative burdens (again), I reasonably request in writing only, their reasons for putting undue stress and burdens upon me by willfully and aggressively refusing to move forward with accommodating me in a positive manner, thereby causing the exacerbation of my chronic disease, as set forth by my doctors. Whether it is in the law or not, once again, I have no sympathy for your clients, and I definitely have issues with any of their reservations as to putting money into this apartment and crying poorhouse, so to speak, law or no law, interpretation or no interpretation.  However, I do have extreme sympathy and empathy for myself as to your clients causing me both mental anguish and exacerbating physical disabilities by refusing to move on to my health issues.

*REFUSAL TO MOVE ME*

I now digress with some personal observations.  As to your clients' take on the interpretation of the Fair Housing Act, I would be remiss if I did not state that it is not their take as to the law, it is your knowledge of it.  I do not sincerely think that your clients are under a financial (or administrative) burden, especially WHCHC, and I honestly feel that HDSI has no clue as to any of this.  Meses.  Ward's and Preston's perspicacity has a lot to be desired, and HDSI readily wants to provide proof to WHCHC that they did not mess up, which they did royally.  They are mismanaging rather than managing, and I personally can expound on that for hours as to how inept they are at management; and, most definitively, as to their non-management of me in the last almost six years.  Moreover, in that I did not just fall off a turnip truck, you are not dealing with an idiot. I put my dead husband through three years of Boalt, and quite possibly you were in diapers when he was studying Prosser on Torts, or not even born yet.  I did not check out your firm's website yet, nor did I look you up in Martindale, and I rather suspect that your parents were in grade school at the time.   That only leads up to the fact that I worked for lawyers for 20 years in an independent contracting capacity, and I (again) am no dummy.  The law can be interpreted in just any way you and your clients want it to be interpreted in order to benefit themselves, your clients.  Minus all your legal mumbo jumbo, the bottom line is that your clients (and I am now referring to WHCHC) can easily move me into an apartment that has the requirements about which my doctors are adamant is not Hayworth House (when available).  It all amounts to the fact, I suspect, that they do not desire to do that, and, if you will, that has serious ramifications as to the law and their dragging their tails since time immemorial as to accommodating me.

*HDSI COPD REFUSAL TO MOVE ME*

As to another bit of personal information, my first cousin is technically WCHCH's client because she is paying the rent.  Additionally, I myself am most probably paying the rent unknowingly because my cousin has a way of taking out money that is eventually due me way into the future. Parenthetically, we have no love lost for each other, but most importantly, she would not just fork out her own cash for me.  That being said, my cousin procured the loan for the reconstruction of this particular building for your clients, and adding to that, she and Ana Ward have been bosom

*ESTON RENT HDSI*

buddies for over 20 years.  As to HDSI managing this building, I am not sure of what my cousin's recommendations for that to WHCHC, but I am sure that my cousin, when she talked to me, told me that I did not make the cut, and I was not going to get into this building. Therefore, I was still low on the so-called "list."

*PREEMPT WAIT LIST IMP! CONDITIONS IN MOVING HE*

Ana Ward then calls me, and suddenly I am back into this building and that is called not being kosher, so to speak.  People were ahead of me on the list.  As you know, this is called string pulling, politics, preferential treatment or whatever, and I am not sure that WHCHC is even aware of all this.   Additionally, this apartment was unwanted.   It is a bastardized handicap apartment that could not be coded by the City of West Hollywood.  That said, I was put into an apartment that nobody else would take and basically I was put into it illegally as I did not financially qualify for it. Ana Ward did somersaults to convince me that I did qualify, which I did not, and that, in a nutshell, is another reason why HDSI dragged their tails, coupled with bringing up the past unacceptable apartments that they offered me, instead of addressing the real issue. If I may be so presumptuous, a lot of what transpired between myself and Ms. Ward at our initial meeting is very deep in the circular file and gone forever. It is almost like Ms. Ward probably has information to hide, which well she should have.  That has been going on for six years, and additionally my cousin pulls the strings as well.  She refuses to pay anything past $340 and therein lies another excuse for all of these happenings.

*QUALIFYING FOR ANY WEST HOLLYWOOD LOW-INCOME DWELLING*

The moral of the story is that if I qualified for this apartment, as Ms. Ward claims, then I qualify for any other apartment under WHCHC's complex's ownership (purview).  And, I do not wish to be attached to HDSI at all, and therein lies the problem for them for some reason.  I refuse to believe that WHCHC will never have an opening in another building here in West Hollywood that is environmentally and structurally conducive for the management of my medical conditions and thereby, making room for the next person on the list to move into this apartment.  That saves tremendous costs for your clients as well, and, it is no skin off their noses.  And they have the power to put me on the top of the so-called list, and, as a matter of fact, do whatever they want to do, as per my example of my getting into this building.  As it is, my opinion is that nobody on the list knows where he/she stands anyway.

Moving on, regarding the installation of air purifiers, I am unclear as to what HDSI inferred as to the installation of purifiers.  The only air purifiers that I am aware of are portable and come in different output capacities and sizes.  Please clarify this point, in writing only, directly to me.

*PARKING*

Regarding my request for parking, I provided WHCHC with a doable alternative as to a garage in which I would be willing to park located in another one of their buildings nearby. Said building is not managed by HDSI, and I am strongly suggesting to you that HDSI will not admit to the fact that Mr. Gritsenko is giving away available parking spots within this building at will — and I have been a witness to that — and to whomever he feels he wants to, so to speak.  I contend that it is preferential treatment, which HDSI denies.  However, the point is that it is no skin off WHCHC's nose (and pardon the use of the vernacular) so to speak, to provide me a parking space in their other building.

*DENSE URBAN SETTING DANGER AT NIGHT! COPD*

Moreover, you will readily state that there is a "dense urban setting" in West Hollywood as to air quality which obviously is to the benefit of your clients relative to their not being willing to provide me another apartment away from the street and all the secondhand smoke coming in from your tenants (please see subsequent paragraphs below). However, you will not readily admit that this neighborhood is not safe at night, and major crimes have been committed nearby, along with other incidents, drug-related and not, homeless-related and not.   I can recommend your talking to a lieutenant to whom I spoke recently at WHSD to verify that. Parenthetically, I cannot run from dangerous situations anymore, and all this is not only related to stress and anxiety, but also to the physical damage to my lungs and breathing ability should the need arise.  That being the case, the wheezing that goes with my COPD, coupled with being

out of breath, has increased to the point that my lungs hurt.  Therefore, I am not willing to risk my life, in any case, on the possibility that a dangerous situation should occur.  I am concluding as to closed and nearby garage space, that your clients do not deem it as "reasonable accommodation" in your interpretation of the law, but it is a "reasonable accommodation" in my interpretation of the law.  It is additionally a reasonable request, as well as a doable request, if you want to get into semantics.

*HAVING TO EXPLAIN*

As to my request to vacate Hayworth House altogether, that is taken out of context and therefore an inaccurate statement.   My doctors want me out of this particular apartment particularly because of the toxic secondhand smoke coming from tenants on property in front of my windows, coupled with the pollutants that come from fumes, toxins such as dirt arising from garbage collections, street cleaners, and automobiles.   I cannot open my windows that are facing the street, and it is questionable whether or not I can even open my blinds covering an open window in my living room as tenants light up on their way out of the gate.

*TOXIC INHALENTS*

I am very open to having a chemist take a sample from my bathroom window which I sometimes have cracked to let steam out, and also have opened a bit when I am not in the bathroom (and I can keep the door closed).   The blinds are new and are usually white, and they are cleaned periodically by my housekeeper. They get filthy from the outdoor pollutants, dirt and grime, and I have bottles and small containers near the window, and they collect black dirt and grit from outside toxins and can be cleaned. I am breathing in all of this filth, and I have pictures of my lungs to prove it.    At any rate, I am sure the chemist can certainly provide some scientific findings as to what the grime, filth and dirt consists of.

*HAVING TO EXPLAIN POLLUTANT FREE*

Dr. Mazza's meaning of good ventilation is my not being exposed to secondhand smoke caused by tenants smoking on property, and other toxic pollutants in the air (see paragraph above).  Her contention is that I should not have to open windows only to be exposed to impurities coming from the sources I described above.  It is grasping at straws on your part to take Dr. Mazza's wording literally inasmuch as in West Hollywood or not, we are all exposed to air pollutants everyday.  She is further stating that I am exposed to an excessive amount of air pollutants and secondhand smoke because of the location of my apartment.   You are therefore incorrectly inferring from her wording that she is intimating that I belong in a sterile environment such as in the movie "Safe."  This is not only a preposterous interpretation, it is highly unrealistic.

*HDSI*

Additionally, my request was therefore made to completely divorce myself from the ineptness of HDSI, coupled with the attitudes of Meses. Ward and Preston, to be specific, along with their apparent inability to handle this matter in a mature, businesslike, non-aggressive and expeditious manner.    Their correspondence has been filled with impertinent, aggressive, insolent, disrespectful, unrelated, and, I might add, impudent comments.   To-wit, I had "had enough," as I stated to Ms. Ward, and basically I said I wanted "out of this apartment and out of this complex."    I do not have to be subjected to HDSI's lack of respect through their representatives, and I will not be.  Therefore, it is my wish to be out of the auspices of HDSI and for the reasons stated above.  In that I am not about to wait years for WHCHC to accommodate me, i definitely will not be in any building "mismanaged" by HDSI, period, and that is my prerogative.  And it remains doubtful that there can be any amicable resolution to this situation.

In regard to your clients valuing "our" relationship, I find that statement insulting, and I highly doubt the veracity of "valuing," as well as that a resolution can come about in an amicable manner between us considering that my physicians want my apartment changed.  Be assured that is only on your clients' part, as it is my feeling that they are showing inordinate amounts of disrespect for me as relating to my chronic medical conditions, coupled with their unwillingness to accommodate me in another building owned by WHCHC.  It is okay for HDSI to handle this with no reverence for business procedures coupled with showing no respect for me, but when it